Okay, Ms. White. Thank you, your honors. May it please the court. My name is Shelby White, and today I'm here on behalf of the appellants. A police officer is not entitled to use deadly force against a citizen who is not capable of hurting him at the time he decides to shoot. Here, Turner, our plaintiff here, is on the ground several feet away from Officer De La Cruz and incapable of hurting him at the time that he shot her. There are three main issues I'd like to touch on today. First, under the objective reasonableness prong, the quote-unquote act that led Officer De La Cruz, excuse me, that Officer De La Cruz claims necessitated his use of deadly force. Under that same objective reasonableness prong, the material factual disputes are not appropriate for summary judgment under toll and be caught, and then last, the clearly established law. When we talk about the act that De La Cruz claims necessitated the use of deadly force, we have two ways that we can look at it. First, we can look at the actual objective video evidence of what the act is, and then second, we can look at what he says or his reason for why he decided to shoot. When we look at the video evidence, you can see that Turner is laying on the ground on her back, and she starts to sit up, and he's several feet away from her, and that's when he shoots. He shoots when she sits up. And so if that is the act that necessitates the use of deadly force, she doesn't have any sort of weapon she can use on him from that distance. It seems artificially narrow, in my opinion. I've watched the video. I mean, what had she done five seconds before that? And I think that's the issue, is that if you're... I'm asking you, what had she done five seconds before that? She's... They've been tussling on the ground. He tased him. And I think, I mean, I would disagree with whether the evidence shows that. He claims that, but even if that is what happens, the point is that the tasing is over, and he's now moved away. In your view, we see a lot of these cases. This one, admittedly, has some shocking facts, and the video is shocking. What do you think the officer... What do you think an officer, this officer, any reasonable officer, should do in such a circumstance? So I think when you are far enough away that the person you are tussling with or whoever, when they can't do anything to you from that distance, you're not entitled to use deadly force. I know. I know you... I know you... I know you... I understand what you think he shouldn't do. What do you think he should do? I think he should... I mean, in this case, he has more time to see what she's going to do. What should he do? He shouldn't shoot. You said... I know what you think he shouldn't do. What should he do? I mean, there are... We have to put ourselves in the position, not only of the decedent, but also the officer. We're not... We're not... I mean, we're not there. We can see the video, but what should the officer do in such a circumstance? I mean, I keep saying shouldn't shoot, but I think the active version of that is wait. I mean, I... So the officer has taser barbs in his groin? No, he does not. So... Okay. Yeah, so the taser... We've seen the video. No, so the taser has two wires that deploy, and once those have been deployed, the wires have been used. And so the wires were... He deployed the taser using the wires against her, and they are stuck in her housecoat. When they're talking about using the taser after that, it has to be skin-to-skin contact with the two prongs. And so he has... She has to get up and physically move and make physical contact with him in order to use the prongs again. You're simply denying that she used a taser on him? Yes, but also I think that doesn't matter for purposes of the time that he decided to shoot. The immediate... In terms... I just... You know, there's a lot of law in this circuit on qualified immunity. It's very important. We see qualified immunity cases all the time. But I ask myself, in any case, what is the officer facing this situation supposed to do? And you say he's supposed to wait. When you're talking about deadly force, I mean, there are... When it's less than deadly force, there are different factors at play. When it is deadly force, they basically say... Not basically, the court says it has to be immediate, deadly, or very serious force that can be used against you. So, for example, the cases that Apple Lee has cited in their 28J letter, throwing rocks or shooting. But we also have Rays v. Bridgewater, which we cited in our brief, for example, that involves a knife. And when you're talking about a knife, obviously, you have to be in physical contact with the person to use it. And the court said, in a similar scenario to what we have here, when y'all are a distance away and the person is holding a knife, they have to... They have to be starting to get closer to you. They have to... There has to be more than just this distance where you're not entitled to shoot them when they're standing far away from you, basically. What case from our circuit or the Supreme Court, in your view, would have given this officer notice? I recognize that cases don't have to be directly, factually on point. But what case would have given this officer notice that using deadly force at this point was unreasonable? I think Rays v. Bridgewater gives that notice because Rays v. Bridgewater gives a very... Well, what are the facts? Tell me, what are the... If you were counseling the police department and you said, look, if you have a situation like this, here's this case, and this case shows you what you should and should not do. So how would you explain to a police officer, given the facts of that case, how it informed his reaction in this circumstance? Yes. So in Rays v. Bridgewater, what happens is they come into the plaintiff's home and he is standing in his kitchen holding a knife. And there is a factual dispute as to whether or not he made a move towards the officer. But it's undisputed that there's some distance between them. And the court says, under the plaintiff's version of events, when he hasn't... When the move or not move is debatable, when that's the factual dispute, if he has not moved, as the plaintiff alleged, you cannot shoot him. And so if an officer at your briefing on this case said to you, well, that seems different, because the person who was shot and the officer weren't involved in a hand-to-hand combat involving a taser that was used on the officer. So really, that case tells me what I should and shouldn't do? Isn't that a relevant difference? And so I would disagree with the relevant difference because I think the other case that Rays cites to within it is BAC v. Ledger, which we didn't cite to in our brief, which is 207 Fed Appendix 374, and it's from 2006 from this court. But Rays cites to it as basically, this is a case with similar facts to ours. The only difference in BAC is that they had a tussle beforehand. They had been in a physical combat situation and then had broken apart. And so it's a little bit more analogous to ours in the sense that they had some hand-to-hand contact and then have broken apart and now have distance between them. In BAC, again, they have a knife. I'm not sure that there's any case in this court with a taser involved in this sort of situation. So when we're talking about... Is there a case in which the officer's own weapon is turned on the officer? I'm not aware of one where a taser has been turned against the officer. I think the issue we have with the taser is that if she tased him, the tasing has already happened. It's in the past and he is now broken away and moved away from her. He's several feet away from her. And so she cannot tase him from several feet away. Let me ask you a different line of inquiry. Number one, unlike all these other cases we had earlier, we're not here on 12B6, right? Yes, we're here on summary judgment. Finally on summary judgment. So we're looking at construing the facts, you know, like most favorable, but there's stuff in here besides the complaint, right? So let's back up a step. The officer involved, this is an apartment complex or something, right? So the decedent is a resident there, right? So this guy works what, a part-time job? I mean, like lots of police officers, they live in the complex and, you know, for free. I mean, that happens everywhere, right? Yes. All right. So I'm just trying to get my historical facts correct. With that, does he, quote, know her, know of her, who she is as opposed to, you know, that looks like a burglar? Yes. There's evidence in the record that he admits that he knew of her. He knew that the apartment complex wanted to evict her and he was kind of in, cahoots is probably not the right word, but working with him to get her evicted. And he's also, there's evidence that he had been in contact with her family due to, about her mental health issues before. So he does, it's undisputed that he knows her. Okay. I'm just trying to get to the specific context just before this event, you know, arises. This is what, late evening or something or night? So this is outside, like in the complex area? It's in the parking lot of the apartment complex. So just tell me, what's the precipitating, in other words, is he moving towards her or has his interaction with her because pursuant to the apartment people, you know, he's trying to evict her or what, what's the spark for, does she shout at him, does she say something? What's the initiating of their interaction? Yes. And so there's a bit of a timeline with that. The initial time that he sees her, she is in the parking lot and I think she's kind of yelling. No one's made a complaint to be clear. There's not, there's not a complaint against her. He's not been asked to do anything about her, but she's in the parking lot. He sees her and he runs her name for warrants and he sees that she has a class B misdemeanor arrest warrant out. And so he says, I'm going to arrest her. But then immediately after that, he gets a dispatch call. And so he just leaves on his dispatch call. He comes back about 10 minutes later. She's still in the parking lot, but she's not, at this point, she's not yelling or doing anything. He says that in his deposition that she's just, when he comes back, she's just there. And so he just decides to execute the arrest warrants. And so that's the, that's the initiating contact between them as he approaches her and says, you know, please stop, let me arrest you. All right. So then, I don't want to take up all your time on facts, but I mean, but here's my question. I looked at the videos too. I mean, we probably all have and we know what our law is in the circuit that, you know, the video is the it, you know, the video is the it, but I mean, I looked at them several times over and over, et cetera, et cetera. Is it your view that the videos unmistakably control? I mean, our law is if it does, you know, clearly if the video says it, it doesn't matter what other people say. But I mean, is it the case that these videos are so clear? I mean, to use a sports analogy, you look at the game last night. I mean, they show five different angles of the play, you know, to determine whether the guy's foot was on the line. It took five angles of it and only the one that responds. So I'm asking, are the videos here, the, you know, the coup de resistance, and you're stuck if the videos are as clear as showing that she actually tastes them, et cetera, et cetera, then we're into, could he use the foot, or if they aren't, are we somewhere else in the summary judgment colloquy? Do you follow me? Yes. And so I would kind of take that question in two parts, which is, you're correct. The law, the Scott B. Hayes case says that if the video is undisputed, it would control. The issue we have here is that we have a video, but it doesn't, it doesn't show the disputed factual issues that are relevant. And it doesn't resolve the factual issues we have here. And so we still have a total. And if not, why not? That's what I'm trying to get to. And so they've alleged that she, that she tased him. We have alleged that is not what happened, that they weren't a tussle. It's possible that the taser was knocked, that they were entangled within each other, but it is not disputed from the video that she grabbed the taser. I don't think that there is, that you can see definitively enough in the video that that's how it went down. There is some evidence that she may be at some point had the taser ends up on the ground by her at some point that her DNA is on the taser, but those are not definitive that it happened the way he said it happened in the video does not show that it happened a hundred percent as he said it happened. So we have factual disputes about whether or not she grabbed the taser, but I think in that same vein, it doesn't matter for purposes of the decision he made at the time that he decided to shoot. The issue is the immediacy necessity that is required for the use of deadly force. And once you are a few feet away and the harm that you're alleging is that she's going to tase you. She has to be closer. She has to be closer for it to be immediate and that is honestly that's the crux of this case is you want us to write an opinion that would say if a someone you're an officer is trying to arrest takes control of his taser. The officer cannot use deadly force unless she's close enough to him to tase him and drive stun mode. So yes, because I think there's a misunderstanding that she could do something else with the taser and she can't once the prongs have been deployed. They cannot be deployed again without resetting the taser, which is like a manual, you know, send it back in manually reset it. So the only way she can use the taser is in the drive stun mode, which requires her to make physical contact with him. And if she is laying on the ground and the only move she's made is to sit up with I mean her lower body is still completely on the ground. I just want to understand what rule of law we would have in this circuit that guides police officers and their interaction with people who take their tasers away and I'm I understand where you're coming from in terms of he has she potentially has taken his weapon if that's if that's the way the facts turn out the problem is the immediacy if she was closer to him. I think we'd be in a different position, but she's not and she can't tase him from where she is. And so yes, he has if he lost his taser and that's what happened. It doesn't matter at the time that he decides to use the deadly force. If he had shot her when she tased him that would be different but he doesn't he he gets up and he moves away. And so, you know, the two fighters are different sides of the ring and then he pulls his gun and shoots her and you can't you can't do that. And I understand that we have we have a tussle and we have potentially a weapon that's been taken that does I think it wants us to be in favor of the officer to some degree, but that does not that's not the guiding case law here. The guiding case law here is the immediacy for the immediacy part and we don't have an immediacy at the time. He makes the decision to shoot. All right, miss white. You've saved time for a bottle. Thank you. Thank you, Mr. Selby. Am I pronouncing that right? Selby you are your honor. May it please the court Steve Selby for the city of Baytown, Texas. My one issue is rather limited and so we have allocated time as such and I will try to be as brief as possible and seed whatever time remaining to Mr. Helfand on sort of the main issue of the case. The sole issue remaining in the case as to the city of Baytown is plaintiff's ADA claim. Plaintiff chose not to appeal the dismissal of the section 1983 Monell claims that were dismissed by Judge Hanks. In addition, the plaintiffs have not challenged the ruling by Judge Hanks in his motion for summary judgment order that the ADA violation, if any, was not intentional. Judge Hanks dismissed the ADA claims in this case for two reasons. Number one, under Haynes versus Richards, the ADA is simply not applicable to field law enforcement encounters until the scene has been secured and there is no threat to human life. That's Haynes versus Richards and its progeny. Number two, he dismissed the ADA claims because the plaintiff failed to show evidence that officer De La Cruz was aware of a disability and its consequential limitations and there was no evidence that an accommodation had been requested or that an accommodation was open and obvious. That we believe he is correct on both counts. Since 2000, in Haynes versus Richards, it has been the law in this court that the ADA does not apply to an officer's on street responses to reported disturbances or other similar incidents, whether or not those calls involve people with mental disabilities prior to the officer securing the scene and ensuring that there is no threat to human life. In Allen versus Hayes, a 2023 panel of this court examined the case in which a subject with a known history of PTSD to the Houston Police Department was stopped by Houston police officers for a routine traffic stop. During the stop, the plaintiff reached for his wallet, was told not to, the move was interpreted by a threat, and he was subsequently shot and killed by the officers. In rejecting the ADA claim against the officers, the panel held, quote, the law in this court is unequivocal. The ADA does not apply to on street responses to incidents whether or not those calls involve subjects with mental disabilities prior to the officer securing the scene and ensuring that there is no threat to human life. I think that the interesting thing about the Allen opinion was, is that it had the chance, it quoted Haynes, and it had the chance to include the language about disturbances and it did not. It simply said, quote, unquote, incidents. Although quoting Haynes, the panel left that out, Allen was a routine traffic stop, this should have been a routine execution of an arrest warrant. They both turned tragic, but the ADA does not apply to either. My time is running short. I will say that with regard to the second part of this, with regard to whether or not there was a disability and a consequential limitation known, that the best cases that we believe support the Judge Hank's decision, Wyndham versus Harris County and Sly versus the City of Conroe, which talked about the request for an accommodation that was, and there is no evidence that a request for accommodation was made and there's no evidence that it was open and obvious in this situation. Thank you, Your Honor. Thank you, Mr. Shelby. Mr. Coffin. So a question I sometimes ask for lawyers who've been here before, you have any idea how many Fifth Circuit arguments you've made? You asked me that about seven arguments ago, Judge, and I thought long and hard about it. I think it's somewhere around 115. Okay. That's about my best estimate. May it please the Court and good morning. I'm Bill Helfand for Ruben, officer, I'm sorry, for Officer Juan De La Garza. It sounds like there isn't much of a dispute anymore about the Officer De La Garza's use of the taser, although that was a contention, a claim of excessive force at the trial court. Obviously, that's resolved by Judge Duncan's opinion for the court in Cloud versus Stone, which was cited by the trial court and in sight of the brief 27, this court's made it very clear where a suspect resists arrest or even fails to follow police orders, officers do not violate the Fourth Amendment by prohibition of excessive force by using a taser. Of course, that was a clearly established law at the time, and again, I don't think that the appellant is still contending that the use of the taser was unconstitutional excessive force. So let me turn then to the question of the use of deadly force here. In that case, this court's opinion in Salazar-Limon versus the City of Houston, but many others, as Judge Duncan observed, make clear that the inquiries confined to whether the officer or another person was in danger at the time of the threat based upon the totality of the circumstances that the officer faced. And in this case, that question is actually answered quite roundly in favor of Officer De La Garza by the appellant's own expert witness, Mr. Taylor, who testified that Ms. Turner offered, and these are his words, active resistance trying to hurt Officer De La Garza when Turner grabbed the taser, got it away from Officer De La Garza, pointed it at Officer De La Garza, pulled the trigger, and touched the taser to Officer De La Garza's testicle area. That's at page 140 of the record. I have his name as De La Cruz. Do I have that wrong or is it De La Garza? It is De La . . . It is De La Cruz. I don't know what caused me to write down De La Garza. You're correct, Judge. Thank you very much for the correction. What is your response? I mean, Judge Stewart had a colloquy with counsel about videos. This is one of the many cases where we have videos, we have two videos. The counsel opposite, I believe the argument is the video doesn't resolve all the material factual disputes and so therefore this is not a Scott versus Harris case. What is your response to that? Well, first, it does resolve the material factual disputes. The one factual dispute which appellant's counsel raises is the assertion that we don't know the distance between Ms. Duncan and the officer at the time of the shooting, but otherwise the video does address the issue here in that it demonstrates the Ms. Turner's position quite clearly and it demonstrates her efforts to continue to resist up until the time that the officer shoots, but what seems to be happening here is that the lack of certain things in the video, including the distance between the parties, it seems like appellants have used that as an effort for license to create factual scenarios that are otherwise not substantiated. And so really the answer is even to the extent that the video doesn't answer all of the questions here, to Judge Stewart's point and in yours as well, Judge, Scott says the court cannot accept testimony which is clearly belied by the video, but to the extent that the video leaves open questions, it's not room for speculation as to what might have happened or what could have happened. In fact, this court in Orr versus Copeland, Judge Clement writing for the court said that that would inverse Scott's holding and what she meant was that Scott empowers . . . what the court said was Scott empowers a district court to disregard testimony that is at odds at video evidence, but it does not inhibit the admission of testimony that's not refuted by a recording. And so what that means is where there's an open question, then the court looks at what other evidence it has and the evidence that the court has is the officer's testimony, the testimony of the appellant's own expert in accord, and the testimony of the ranger, all of which support the use of deadly force. And lest there be any doubt of that, recently in Argueta versus Gerardi, which is cited in my brief at page 22, last year, this court reversed a district court's denial of a claim of qualified immunity. The district court had denied qualified immunity saying that the court . . . that the Argueta's decedent had in his hand on the video and therefore qualified immunity in summary judgment was not appropriate because it wasn't on the video. This court reversed, again under the holding and or, that the lack of the video doesn't preclude qualified immunity based upon other evidence. And frankly, that's also quite consistent with this court's decision on September 30th in the Winder versus Gallardo case, which was cited in the 28J briefing, because the question there, as the court pointed out, was not whether the video showed the individual who was shot reaching for the gun at the moment that Deputy Gallardo shot, but whether Deputy Gallardo could have reasonably believed that that was what was happening. And that brings me back, if I may, Judge, to your question to counsel. Appellant's counsel posited that because of the distance, which again is not something the appellant has established, they've simply suggested that the distance is not sufficient to allow Ms. Turner to continue to provide the type of physical resistance and efforts to subdue Officer de la Cruz that we see on the video almost immediately prior. Your Honor's question, Judge Duncan, what was happening five seconds before? Not only was she capable of causing Officer de la Cruz harm, she was actually hurting Officer de la Cruz, and that's at record 823-4 in that this answers the question appellant's counsel just raised. She said, we don't believe that he tased, that she tased him, that Turner tased de la Cruz. This is at 823-4. The taser results show the taser was energized while it was in Ms. Turner's hand. She was holding an energized taser, which was shocking Officer de la Cruz at the time. Again, at 1042-1045, appellant's own expert testifies that Officer de la Cruz was entangled in the taser wires and may have felt an electric shock from them. So I don't know, this is my concern, appellant's counsel says there's no video, so I think we could say whatever we want to say about what happened out there. But no, the answer lies then in what evidence the court has, and the evidence that the court has is that Officer de la Cruz had just immediately before this been shocked. And I would submit that this is where these cases, and Your Honor said these cases come before the court quite frequently, this is where these cases are maybe more difficult in this room than they are out in an apartment parking lot. Your Honor asked appellant's counsel, what should an officer do? Well, an officer is trained, but an officer is also a human being, and sometimes folks just disregard the normal human traits of pain and fear, which exist when somebody is in a fight and being shocked and feeling threatened as if they're going to be killed. And Officer de la Cruz had every, not only right, but reason to believe that that's what was going to happen to him. And of course, that's exactly what he told the ranger, Ranger Lopez, in the investigation, and that's exactly what Ranger Lopez said he would expect a reasonable officer to believe. Now, I think Judge Hanks got it 100% correct in focusing his summary judgment order on the fact that the evidence establishes a reasonable use of deadly force under the circumstances created by Ms. Turner. But I also agree with the district court, although he did not go into a lengthy analysis, perhaps because appellants didn't provide case law that required the analysis, that the, as he says at 2180, that the appellants failed to identify any clearly established law that would place beyond doubt the constitutionality of Officer de la Cruz's use of deadly force. This is what Judge Olam calls the doozy aspect of this two-part test. And in that regard, the appellants have completely failed. And I think, in all candor, in response to Judge Duncan's questions, counsels essentially admitted that. The answer that one has to be closer is an interesting theory. But again, closer than what? Because the distance is not actually demonstrated in the record at all, except that we know that it's the distance between the taser itself and its wires, which are 20 feet long. So it's no more than 20 feet long. And we also know that the taser wires are tangled. So it's something even shorter than that. Let me just ask you this, because I don't know that much about tasers. But did I glean from what you were saying? Putting aside who said what, but whatever the examination of the taser gun, et cetera, the physics properties, for want of a better word. Putting aside the video, does that testimony or evidence or examination by whomever satisfy? Indisputably, whatever it is, the properties of a taser. In other words, is there some DNA on the taser gun from her, which would conclusively say, yes, she had it in her hand, that kind of thing, and so forth? Yes, sir. The taser . . . I mean, I just don't know. I'm just asking. Beyond the video and the testimony, but is there an examination by somebody of the taser . . . Yes, your Honor. . . . prove indisputably ABCD&E? Was that something that Judge Hanks took into account in his summary judgment? Yes, Judge. Let me find that reference for you. Ms. Turner's DNA was found on the handle of the taser, so there's no dispute, and I think appellant's counsel admitted that Ms. Turner was holding the taser, and again, counsel says she doesn't believe that Ms. Turner tased Officer Dela Cruz. However, I think this answers your question, your Honor. Again, appellant's own expert, Mr. Taylor, testified he may have felt an electric shock from the taser at the time. That's 1042 through 1045 in the record. Does that address your question, your Honor? It does. Thank you. I didn't mean to derail you from your . . . Returning then to the . . . . . . argument. I'm just trying to understand. I mean, it's on the video, but the taser bit, I don't know as much about . . . Yes, sir. . . . that, and there was some argument about, you know, once you're shot, certain things would have to happen mechanically and so on and so forth. So that's helping. I'll look at the record. Thank you. Yes, sir. Turning then back to the issue of the clearly established law, it's just . . . if the court intends to write an opinion adopting appellant's suggestion that there is a distance requirement for the use of deadly force, I would suggest to the contrary. It creates an unworkable rule that just doesn't address the fluidity of every law enforcement encounter, but it would be new law. It would not be clearly established law. And in fact, there is no distance requirement, and perhaps what demonstrates that to the greatest degree is the Supreme Court's opinion in Mullinex v. Luna, in which, as the court may recall, the Supreme Court reversed this court and held that a state trooper who fired a rifle from a bridge at a moving vehicle more than this distance, I think it was more than 100 feet away, which accidentally . . . the intent of the use of the deadly force was to immobilize the vehicle, but actually struck the driver of the vehicle and killed him. The Supreme Court held that that use of deadly force did not violate clearly established law. So I think we're quite sure that as of today, there is no distance requirement in the clearly established law. And as to the argument that there has to be some immediacy, I think the immediacy is met here by . . . I couldn't put it any better than Judge Duncan's question, what happened five seconds earlier? Again, this is a fluid situation. The officer is fighting with this woman. He's now trying to resist her efforts to harm him and feeling that pain and believing, as he's testified, that he was going to be . . . continue to be shocked and then lose his handgun. He is pulling his handgun out and defending himself in a fluid motion. The opinion . . . again, speaking as to the law that appellant suggests the court adopt would be directly in opposite with this court's decision just over a month ago in McVeigh v. Perez. In McVeigh, the court observed that the assailant threw a rock at the trooper but missed. And so I guess the argument that appellants would posit here is that the rock has to be closer in order to use deadly force. But this court rejected that assertion and said the mere fact that a rock had been thrown, I would analogize that to a taser had been tased, was sufficient to allow the officer to perceive enough of a threat to require the use of deadly force. In that regard, I would finish off by pointing out that just like in McVeigh, in this case, to the extent that Officer Delacruz misinterpreted the threat, then the question under Saussure v. Katz becomes was that a reasonable misinterpretation? Could he reasonably have believed he was threatened even if appellant's counsel thinks otherwise? And obviously that question is answered again by the . . . The test is whether any reasonable officer would in the same situation. Right. Would any reasonable officer, thank you, Your Honor, would any reasonable officer have felt that way? And there you have the rangers and the appellant's own expert acknowledging the risk of serious injury or deadly force, serious injury or death from Ms. Turner's actions. Thank you for the court's time. Thank you, Mr. Huff. And Ms. White for rebuttal. All right, thank you. I'd like to get back to the video evidence and then Delacruz's testimony about why he was shot because I think that answers a lot of what opposing counsel has been addressing earlier. And then as to the ADA issue, unless you'll have some specific questions, we'll rest on our briefs for that. I don't think I have enough time to address both today. I think we have an issue of totality of circumstances versus immediacy, and that is to some degree an unresolved issue in this court as to whether we look at the totality of circumstances to determine the use of force or whether we look to the immediacy of the need for the use of deadly force. And so there is, I think this case kind of brings the anomaly between those two to the forefront because we have a totality of the circumstances. We have a potentially a tasing by her in the five to six seconds preceding his decision to shoot, but then we also have the fact that that tasing, if we're taking his facts as true, that tasing happened and it's over, and now he's gotten up and moved away. And so now in the immediacy of his decision to shoot, the tasing is over. It's not continuing to happen. It cannot happen from where she is at that point. And so is he allowed to shoot in the immediacy of that situation when he makes the decision to use deadly force? When we look at Delacruz's testimony about why he decided to shoot, he says the quote-unquote act that he thought justified the shooting was the tasing. He doesn't talk about the wires tangled around him. When we look at the discrepancy in his factual testimony, he doesn't mention the wires ever being tangled around him until we get to his deposition. So he doesn't tell the other officers at the time of the investigation that that happened, and he also admits in his deposition that that was not a factor in his decision to shoot. He says the only factor in his decision to shoot was the fact that she had tased him. If you look at the video, he is standing over her while she's lying on the ground, and he also talks about that in his deposition in terms of their positioning, when he alleges that he got tased. So he's standing, she's laying on the ground, he gets tased, and then he steps up and moves away. And so this sense that it was so immediate that he had to shoot her at that time, I mean, that's discussed in his deposition. The trial counsel asked him, okay, well, why didn't you shoot her while you were standing over her? And he says, it took me a few seconds to process what had happened and then to kind of move away, and then I decided to shoot. And so even within his own testimony, there's an admission that the danger has passed and that he shot after the danger had passed. And that is the crux of the toll and be caught in factual dispute that we have here, is could a jury look at his actions and say they were or were not reasonable? And unless it's 100% every single time it would be reasonable, then we have a factual dispute and it belongs in front of a jury. This is not really a situation of he very much did the wrong thing or very much did the right thing. It's a factual dispute. I mean, I think this case belongs before a jury with all of the evidence before them as to what happened and the timing of how it happened and whether or not De La Cruz's testimony is actually accurate because as opposing counsel mentioned, the video doesn't really establish everything. And so to the extent we're relying on De La Cruz's testimony, he's the only person that can talk about it because Ms. Turner is dead. His testimony is inconsistent. So he, for example, he says that she grabbed the taser and tased him, but he also has some additional testimony that says he got stuck and that it just discharged against him, that it might have been, that it wasn't necessarily her deliberate actions to tase him. And I think that would be to some extent supported by the fact that they're in a tussle. He doesn't tell the officers on the scene that he got tased. He doesn't seek medical treatment for being tased, but then he also claims that he was in pain for two days and that he thought he could die or be seriously injured by his taser injury. So those facts are in conflict. If you didn't tell anyone you got tased and you didn't seek medical treatment but also you thought it was very serious and you were in fear for your life, those don't mesh. He doesn't cry out in pain or get any physical or verbal indications that he got tased when you watch the video. You see a flash, which doesn't necessarily mean that it made contact with him, but there's not some sense of him jumping up and going, oh, my God, he's just standing over. And then, as I mentioned earlier, he doesn't mention that the wires were tangled in his arms or shocking him until much later, until we're in the deposition stage. Counsel, is it your view that there is a factual dispute about whether he was tased at all? Honestly, yes. So you dispute whether he was tased at all. Is there a factual dispute about whether wires were entangled around him or maybe not? Is that your view of the record? I think that in the video at some point you can see some wires around his arm. I would dispute whether those cause him any pain that would justify shooting, and he admits that that's not why he shot. So I think, to a large degree, that's a non-factor. I think the district court was erroneous in relying on that as a reason for justifying the shooting because De La Cruz admits that that wasn't the reason he shot. I see I'm out of time unless you all have any further questions. If there's anything else that you didn't cover, you can have one more minute, but don't repeat yourself. If there's anything new you want to cover, you're welcome to do that. Well, I'll just ask you a question if you do it in one sentence or so. You know, counsel, I've cited several of our cases, you know, in support of Pazut or Guero and others. I mean, in a single sentence or whatever, do you have any response to the cases that, you know, were cited or which case of ours refutes any of that? Are you referring to the 28-J letter cases? Well, not necessarily. No. I mean, he cited Guero in the brief and some other cases, particularly about, you know, immediacy.  Mullinex and . . . McVeigh. Yeah. Yes. And so I'm just kind of asking from the standpoint, not the facts you've argued there, as Judge Mills said, but just any response or rebuttal to the cases that are relied upon. Yes. So I think we've, in kind of a two-parter, we have, and I have cited to raise a lot, and I do apologize, but I do think that it is certainly the most relevant. There is a distinction between someone who has a gun and can use it against you from a distance, sorry, and someone who has a taser or a knife and cannot use it against you from a distance. That's the distinction also with McVeigh. And to be clear, we have a response to the 28J letter that we'll be filing either today or on Monday. But when you can use your weapon from a distance, then distance is not a factor because you can use . . . the weapon is dangerous no matter how far away you are. And Reyes talks about that, and even McVeigh with the rock throwing talks about that to some extent. They know he has a pile of rocks next to him on the floor and he can continue to keep throwing them, and that's the deadly threat. Here, this Court has said explicitly that tasers are not deadly. It's in the context of an officer using them against an arrestee, but it doesn't matter who's holding the taser. If the taser is not a deadly weapon, it's not a deadly weapon. And it has to be used in physical contact with someone. And so distance is the determinative factor here, to be honest. I believe that Mr. de la Cruz says he was 3 feet away. We allege that he was 18 feet away. The video shows probably somewhere in between there, to be honest. But when you look at the moment that he fires the first shot, which is at around between 39 and 40 seconds on the video, it is clear that he's a distance away from her. He is not on top of her shooting. It is not an instantaneous kind of being tased and then immediately drawing his weapon and shoot. So there is some time and there is some distance between them, and that is the determinative factor, and that's what I think guides the case law here. Thank you, Ms. White. Your case, both of today's cases, are under submission, and the court is in recess under the usual order.